# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE WESTERN DISTRICT OF OKLAHOMA

In re:

DAVID CARL BREEDLOVE and
KELLIE MICHELLE BREEDLOVE,

    Debtors

SCIENCE CARE, INC., an Arizona corporation,

    Plaintiff,

v.

DAVID CARL BREEDLOVE and
KELLIE MICHELLE BREEDLOVE,
husband and wife,

    Defendants.

Case No. 11-15459 SAH

Chapter 7

Adversary No. _____

## COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY

For its complaint against Defendants David Carl Breedlove and Kellie Michelle Breedlove, Plaintiff Science Care, Inc. alleges as follows:

### THE PARTIES

1.      Science Care, Inc. ("Science Care") is an Arizona corporation duly formed and in good standing under the laws of the state of Arizona, with its principal place of business located in Maricopa County, Arizona.

2.      Defendants David Carl Breedlove ("Mr. Breedlove") and Kellie Michelle Breedlove ("Mrs. Breedlove," collectively the "Debtors"), chapter 7 debtors in the above-captioned chapter 7 case, are husband and wife residing in Cleveland County, Oklahoma. All of the acts alleged herein on the part of Mr. Breedlove were carried out for the benefit of his marital community with Mrs. Breedlove.

807130

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

4. Venue is proper in this district under 28 U.S.C. § 1409.

5. This is a core proceeding under 28 U.S.C. § 157.

## FACTUAL BACKGROUND

6. Science Care is an Arizona corporation that operates a non-transplant whole body donation program, the purpose of which is to provide human tissue for medical research and education. Science Care's principal place of business is located at 21410 N. 19th Ave., Phoenix, Arizona. Science Care also has laboratory facilities in Phoenix and Colorado.

7. Prior to September 17, 2009, Science Care employed non-defendant Greg Martenson ("Martenson") as its President and Chief Operating Officer, non-defendant Donna Goyette ("Goyette") as its Director of Community Relations, Defendant David Breedlove as its Director of Laboratory Operations and non-defendant Gregory Paulos ("Mr. Paulos") as its Vice President of Professional Education (collectively, the "Executive Employees"). Mr. Breedlove commenced his employment with Science Care in approximately May 23, 2005.

8. The Executive Employees' duties included supervision and oversight over all aspects of Science Care's business.

9. Science Care devotes substantial resources, including money and personnel, to establish, develop, and maintain client and contact relationships, and to develop its own internal policies, procedures, techniques, strategies, pricing and training materials.

10. A significant amount of the information established, developed, and maintained by Science Care derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other

807130

2

persons who could obtain economic value from its disclosure or use.

11.     Science Care's customer information, including referral sources, its internal policies, procedures, techniques, strategies, financial information, pricing information and training materials are confidential information.

12.     Science Care takes reasonable steps to protect is confidential information from disclosure, including, among other things, use of non-competition and confidentiality covenants in employment contracts, requiring key card access to enter its buildings, and use of video cameras and user level password security on its computers.

13.     The Executive Employees, including Mr. Breedlove, had access to the following types of Science Care confidential and trade secret information: customer lists, supplier lists, equipment lists, pricing policies, costs of doing business, marketing strategies, strategic plans, policies and procedures (including the blue print for setting up a tissue bank) and methods of doing business.

14.     The Executive Employees, including Mr. Breedlove, had unrestricted access to all operational and financial information of Science Care.

15.     Given the nature of the Executive Employees' positions in Science Care, and considering that the Executive Employees were entrusted with considerable confidential and trade secret information of Science Care, Science Care required and the Executive Employees agreed, for valuable consideration, that for one (1) year after their employment with Science Care terminated they would not "[d]irectly or indirectly, either as principal, agent, employee, officer, shareholder, director, member or manager of any corporation, limited liability company, or other entity, or as a partner or sole proprietor, or in any other capacity, engage in any business competitive or substantially competitive with the Company. This restriction shall apply in each State where the Company and/or its affiliates have an office."

16.     The Executive Employees, including Mr. Breedlove, also agreed in their

807130

respective Employment Agreements that they would not, for a period of two (2) years after their termination from Science Care, "solicit, induce, or recruit any of Company's employees to leave Company's employ."

17.     The Executive Employees, including Mr. Breedlove, also agreed in their respective Employment Agreements that they would not, for a period of two (2) years after their termination from Science Care, "directly or indirectly, either individually or as an employee, partner, stockholder, associate, consultant or in any other capacity, alone or through or with any other person(s) or legal entity:

(a)     solicit or handle the business of any customer of the Company (i) who or which was a customer of the Company at any time within twelve (12) months prior to the end of Employee's employment by the Company or (ii) who or which was a customer of the Company with whom or which the Employee has significant contact while an Employee of the Company or about whom Employee had access to Confidential Information; or

(b)     accept the business of any such customer.

The Employee agrees to cause anyone with whom the Employee may be employed or by whom the Employee may be employed to decline to accept such business within the two-year "hands off" period."

18.     In or about late 2008, while still Executive Employees of Science Care, non-defendant Mr. Paulos and non-defendant Mr. Martenson agreed to start a business to compete with Science Care.

19.     Non-defendant Mr. Paulos and non-defendant Mr. Martenson thereafter recruited Defendant Mr. Breedlove and non-defendant Ms. Goyette to participate in starting a business to compete with Science Care.

20.     Throughout 2009 until September 17, 2009, the Executive Employees (including Mr. Breedlove) proceeded to gather confidential and trade secret information of

807130

4

Science Care in order to start their new competing business.

21. On June 8, 2009, the Executive Employees caused Articles of Organization for a company called Genlife Institute, LLC ("Genlife") to be formed.

22. The Members of Genlife listed in its Articles of Organization are Defendant Mr. Breedlove, and non-defendants Mr. Paulos, Ms. Goyette and DMP Capital Partners ("DMP"). DMP is owned by Darin Corbett and Hal Ezzel, both of whom reside in Oklahoma. Defendant Mr. Breedlove and non-defendants Ms. Goyette and Mr. Paulos had contact with Mr. Ezzell and Mr. Corbett solely because of their employment at Science Care. Corbett Funeral Home and Allen Funeral Home referred donors to Science Care.

23. The Executive Employees agreed with non-defendant Mr. Corbett to provide it the "institutional knowledge" necessary to start a tissue bank in Arizona, and in return Darin Corbett and Hal Ezzell, through DMP, agreed to invest nearly all of the start-up capital for Genlife, provide Genlife a temporary location for its operations at Allen Funeral Home, and provide Genlife an average number of donors per month through Corbett Funeral Home, all in order to assist Genlife in sustaining its business at start-up despite having full knowledge of the Executive Employees' Employment Agreements and their intent to steal confidential information of Science Care in doing so.

24. Effective July 13, 2009, the date of Genlife's Operating Agreement, Mr. Paulos became Genlife's Chief Executive Officer and President, Ms. Goyette became Genlife's Secretary and Vice President of Operations, and Mr. Breedlove became Genlife's Treasurer and Vice President of Operations. Each of these individuals also served on Genlife's Board of Directors as "Operational Directors." As Operational Directors, they were responsible for the day-to-day management of Genlife, even though from July 13, 2009 to September 17, 2009 they remained the top executives at Science Care.

25. Genlife started its operations at Allen Funeral Home at 1103 S. Horne in Mesa, but moved to 3620 E. Weir Ave. in Phoenix, a location within a twenty-five mile

807130

radius of Science Care's Phoenix office (19.9 miles).

26.     Like Science Care, Genlife operates a non-transplant whole body donation program, the purpose of which is to provide human tissue for medical research and education.

27.     On September 17, 2009, Defendant Mr. Breedlove, and non-defendants Mr. Paulos and Ms. Goyette, voluntarily resigned from employment with Science Care without explanation.

28.     After their voluntarily resignations from Science Care, Science Care learned of the existence of Genlife.

29.     Science Care then launched an internal investigation wherein some of the details contained herein were revealed by, among other Science Care employees, non-defendant Mr. Martenson who admitted that he had originally intended to leave Science Care with Defendant Mr. Breedlove, and non-defendants Mr. Paulos and Ms. Goyette, but changed his mind after having a falling out with Mr. Paulos.

30.     Various Science Care employees, including Mr. Martenson, advised that the Executive Employees had engaged in numerous acts violative of their respective Employment Agreements and fiduciary duties with Science Care prior to resigning from Science Care, including without limitation, copying or causing other employees to provide the Science Care customer list, equipment list and internal legal advice regarding regulatory requirements for businesses like Science Care, all under the guise of conducting legitimate Science Care business.

31.     Science Care also discovered documents indicating that Genlife intended to sustain itself through receiving an average number of 35 donors per month from Corbett Funeral Home.

32.     Science Care also discovered that Defendant Mr. Breedlove and non-defendants Ms. Goyette and Mr. Paulos obtained financing for Genlife through Science

807130

6

Care contacts, Hal Ezzell and Darin Corbett.

33.     Science Care also discovered that in the several months prior to their resignations, the Executive Employees caused payments from Science Care to Corbett Funeral Home to be increased so that Corbett Funeral Home was paid more for providing services than any other funeral home in Oklahoma.

34.     In the days and weeks before resigning from Science Care, Defendant Mr. Breedlove and Ms. Goyette and Mr. Paulos accessed Science Care's confidential information.  During that time, Paulos printed a number of documents containing Science Care's confidential information.  Defendant Mr. Breedlove and Ms. Goyette and Mr. Paulos utilized Science Care's resources and confidential information in the planning, formation and operations of their competing tissue bank.

35.     Defendant Mr. Breedlove and non-defendants Mr. Paulos and Ms. Goyette also engaged in activities to undermine the operations of Science Care during the months preceding their resignations by causing some Science Care customers to cancel contracts with Science Care and causing some Science Care customers to switch to Genlife thereby causing Science Care great losses.

36.     Immediately following the resignations of Defendant Mr. Breedlove and Ms. Goyette and Mr. Paulos, Science Care's Chief Executive Officer, James Rogers, met with managers and other employees in an effort to stabilize Science Care and assure employees that the company would continue to operate notwithstanding the simultaneous resignation of three of the four members of its executive team.

37.     Following the resignations of Mr. Paulos, Ms. Goyette and Mr. Breedlove, Science Care spent considerable time, money and effort restructuring its organization and rebuilding its executive team.  In this process, some employees received raises and promotions, and many assumed additional job responsibilities.  Because Genlife immediately commenced operation, and because Science Care's confidential business and

807130

marketing strategies were in the hands of this new competitor, Science Care had to change its business and marketing strategies, including pricing information.

38.    Defendant Mr. Breedlove, and Ms. Goyette and Mr. Paulos, did not have tissue banking experience before employment with Science Care. They learned to manage a tissue bank through their work at Science Care. They had relationships with Science Care's customers, including referral sources, which were developed while they were employed at Science Care.

39.    Given the operational knowledge and experience Defendant Mr. Breedlove and non-defendants Ms. Goyette and Mr. Paulos acquired while working for Science Care and their access to Science Care's confidential information, including internal policies and procedures, customer and referral source lists, marketing strategies, and pricing information, they gained a unique competitive advantage in non-transplant tissue banking during their employment with Science Care.

40.    Most of Science Care's revenue generating customers (those who purchase tissue) are located outside the State of Arizona, and some are located outside the United States. Some of these customers regularly come to Arizona to use Science Care's training facility in Phoenix.

41.    Science Care received whole body donations from all over the United States. Approximately 45% of its whole body donations originate from the State of Arizona, and almost 70% of those donations come from within Maricopa County. In 2009, approximately 25% of its donors were from hospice or funeral home referrals, and the remaining donors were from friend or family referrals. Science Care continues to attempt to build relationships with hospices and funeral homes to increase its donors through referrals from these entities.

42.    Based on the facts then known to it, on October 13, 2009, Science Care filed a lawsuit in the Superior Court of Arizona, Maricopa County, Case No. CV2009-032397

807130

8

against the Debtors, and non-defendants Donna Goyette, Timothy Goyette, Greg Paulos, Domitila Paulos, Greg Martenson, Kristen Martenson, DMP Capital Partners, Genlife Institute, Allen Funeral Home and Arizona Cremation, Corbett Funeral Home and various unknown John and Jane Does and ABC Entities (the "Arizona Litigation"). In the Arizona Litigation, Science Care asserted claims against the Debtors, and the other defendants named in the Arizona Litigation, for: (1) Misappropriation of Trade Secrets; (2) Breach of Contract; (3) Breach of Fiduciary Duty; (4) Civil Conspiracy; (5) Aiding and Abetting; (6) Unfair Competition; and (7) Intentional Interference with Contract or Business Expectancy.

43.    On October 13, 2009, Science Care filed in the Arizona Litigation an Application for Preliminary Injunction requesting the Maricopa County Superior Court to enjoin Mr. Breedlove (and Ms. Goyette and Mr. Paulos) from violating certain restrictive covenants in his Science Care employment agreement with respect to confidentiality, non-competition, employee raiding and anti-piracy. The Maricopa County Superior Court entered a temporary restraining order on October 22, 2009.

44.    During the preliminary injunctive phase of the Arizona Litigation, Science Care discovered that Mr. Paulos, Ms. Goyette and Mr. Breedlove had destroyed substantial amounts of evidence and Science Care documents. In particular, prior to resigning from Science Care, Mr. Paulos. Ms. Goyette and Mr. Breedlove permanently deleted files from Science Care computers in a manner not authorized by Science Care, using Secure Clean, which was not an approved software application at Science Care. Mr. Paulos deleted 33,896 files, Ms. Goyette deleted 11,131 files, and Mr. Breedlove deleted 656,974 files, for a total of 702,001 files. In addition, following the filing of the complaint in the Arizona Litigation, Mr. Breedlove used Secure Clean to permanently delete files from his Genlife computer, and Mr. Paulos and Ms. Goyette used Secure Clean to permanently delete files from their Genlife and home computers.

45.    As a result, Science Care filed motions for sanctions for spoliation of

807130

9

evidence. In the Maricopa County Superior Court's Minute Entry dated July 2, 2010, addressing Science Care's Renewed Motion for Sanctions Against Defendants for Spoliation of Evidence (the "Evidence Destruction Motion Sanctions Motion"), the Superior Court noted that it was undisputed that the individual defendants had destroyed evidence and the court set an evidentiary hearing on the matter.

46.     On November 1 through 4, 2010, the Maricopa County Superior Court conducted a four-day evidentiary hearing in the Arizona Litigation concerning, among other things, Science Care's Application for Preliminary Injunction and its Evidence Destruction Sanctions Motion. After taking the various matters under advisement, the Maricopa County Superior Court issued a Ruling on March 7, 2011 (the "Ruling").

47.     In the Ruling, the Maricopa County Superior Court found and determined, among other things:

> Based on the evidence presented at the evidentiary hearing, the Court finds that the spoliation of evidence by Defendants Goyette, Paulos and Breedlove goes beyond that referenced above [in the court's minute entry dated July 2, 2010]. For example, forensic analysis of the Defendants' GenLife and home computers reveals that after the filing of the complaint, Defendants appearance in the case and the entry of a temporary restraining order, Defendant Breedlove ran wiping software to permanently delete files from their GenLife and home computers.

> The wiping software used by Defendants Goyette, Paulos and Breedlove permanently removes files so that they are unrecoverable—even by a computer forensics expert using forensic software. As stated by Science Care's computer forensics expert, Craig A. Reinmuth, the wiping software used by these Defendants "doesn't just delete files; it overwrites files with '0's' and '1's a number of times to the point they become unrecoverable. It erases data to 'Department of Defense' standards. ... Once it is used, it does not permit a forensic recovery of deleted files. Recovery could have taken place if the files had simply been 'deleted' in the normal manner."

807130

10

The number of files permanently deleted by Defendants Goyette, Paulos and Breedlove is astounding. On their Science Care computers alone, they deleted more than 702,000 files shortly before resigning from their employment and commencing operation of GenLife.[3] This number does not include the thousands of files deleted from their GenLife and personal computers and the few USB devices produced for imaging after commencement of this case, nor does it include any files on the eighteen USB storage devices shown to have been connected to their Science Care computers, but never produced for imaging in this litigation.

Defendants Goyette, Paulos and Breedlove contend that they used the wiping software to prevent access to their personal information and confidential donor information and to free up space on their corporate computers. Their testimony regarding their good intentions, however, is not credible. Rather, the evidence establishes that they engaged in a concerted effort, on behalf of themselves and their newly formed business, GenLife, to intentionally and willfully destroy evidence that they knew, or reasonably should have known, was potentially relevant to litigation that they knew was likely once they resigned. The evidence further establishes that they continued their intentional and willful destruction of relevant evidence after the commencement of this case and in the case of Paulos, after a warning by Science Care's counsel of his duty to preserve evidence. **Defendants' conduct cannot, by any stretch of the imagination, be characterized as innocent or unintentional.**

In this case, Science Care requests that the Court enter default against Defendants Goyette, Paulos, Breedlove and GenLife as a sanction for the spoliation of evidence.[4] As noted by the Arizona Court of Appeals, "issues concerning destruction of evidence and appropriate sanctions . . . should be decided on a cases-by-case basis, considering all relevant factors. . . . 'Destruction of potentially relevant evidence obviously occurs along a continuum of fault—ranging from innocence through the degrees of

---

[3] Defendants Goyette, Paulos and Breedlove deleted these files notwithstanding the fact that their employment agreements expressly prohibited the deletion of files from their Science Care computers. At least some of the deleted files directly concerned their plans regarding GenLife.

[4] In its Amended Closing Argument, Science Care also requests that default be entered against Defendant DMP. There is, however, no evidence that DMP directed the activities of Defendants Goyette, Paulos and Breedlove, or that it was otherwise involved in the spoliation of evidence.

807130

11

negligence to intentionality. The resulting penalties vary correspondingly.'" *Souza v. Fred Carries Contracts, Inc.*, 191 Ariz. 247, 250, 955 p.2d 3, 6 (App. 1997), quoting *Welsh v. United States*, 844 F.2d 1239, 1246 (6th Cir. 1988).

In addressing the dispositive sanction of dismissal in a case involving, spoliation, the Ninth Circuit stated the following in *Leon v. IDX Systems Corporation*, 464 F.3d 951 (9th Cir. 2006):

Before imposing the 'harsh sanction' of dismissal . . . the district court should consider the following factors: '(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.'

While the district court need not make explicit findings regarding each of these factors, a finding of 'willfulness, fault, or bad faith' is required for dismissal to be proper. Additionally, the district court must consider 'less severe alternatives than outright dismissal. ...

A party's destruction of evidence qualifies as willful spoliation if the party has 'some notice that the documents were *potentially* relevant to the litigation before they were destroyed.' Moreover, because 'the relevance of . . . [destroyed] documents cannot be clearly ascertained because the documents no longer exist,' a party 'can hardly assert any presumption of irrelevance as to the destroyed documents.' ...

The prejudice inquiry 'looks to whether the [spoiling party's] actions impaired [the non-spoiling party's] ability to go to trial or threatened to interfere with the rightful decision of the case.'

464 F.3d at 958-59 (citations omitted; emphasis in original).

The Court has thoroughly considered the above factors and concludes that a dispositive sanction against Defendants Goyette, Paulos, Breedlove and GenLife is appropriate in this case. The Court concludes that Defendants Goyette, Paulos and Breedlove willfully destroyed hundreds of thousands of files shortly before they resigned from their employment and after this litigation commenced in an attempt to prevent Science Care from examining the evidence. Given the circumstances of the destruction, the Court finds that the Defendants intended to impair

807130

12

Science Care's ability to effectively litigate this case. In reaching these conclusions, the Court notes, in particular, the following:

Defendants' actions clearly have jeopardized the fact-finding process in this case to the prejudice of Science Care. Although Science Care has obtained some of the deleted documents from Defendant Greg Martenson's ("Martenson") computer and through the use of computer forensics experts and subpoenas served upon third parties, it will never know if it has recovered all of the documents that support its claims. Significantly, Science Care incurred considerable attorneys' fees, expert witness fees and other expenses to recover these documents.

In addition to causing these unnecessary fees and expenses, Defendants' spoliation has resulted in unnecessary delays in litigating the issues in this case and the unnecessary expenditure of judicial resources. Further, other than the records discovered on Defendant Martenson's computer and the records Science Care has recovered through the efforts of its attorneys and experts, Science Care has had no opportunity to examine the evidence destroyed by the Defendants.

As in *Peschel v. City of Missoula*, 664 F.Supp. 2d 1173, 1146 (D. Mont 2009), "[t]he circumstances presented [here] mandate [a severe] sanction in order that the fair and orderly administration of justice is restored to these proceedings." While Defendants proposed a monetary sanction of $50,000, and while such a sanction would cover *some* of the fees and expenses incurred by Science Care in recovering *some* of the documents, it would not sufficiently punish defendants for their willful destruction of evidence, nor would it serve as a sufficient disincentive to destroy evidence. Similarly, an adverse inference jury instruction alone or in conjunction with monetary sanctions would be insufficient to cure the prejudice to Science Care resulting from the volume of evidence destroyed. A dispositive sanction is appropriate in this case. Any lesser sanction would be ineffective and result in the Court effectively condoning the spoliation. Accordingly,

IT IS ORDERED granting Science Care's Renewed Motion for Sanctions Against Defendants for Spoliation of Evidence.

IT IS FURTHER ORDERED striking the Answer of Defendants Goyette, Paulos, Breedlove and GenLife and entering default against them on the First Amended Complaint. . . .

807130

13

(Ruling, pp. 9-12) (Emphasis supplied).

48.    After allowing the parties time to conduct discovery in the Arizona Litigation, the Maricopa County Superior Court scheduled an evidentiary hearing to commence on November 21, 2011 to determine the amount of Science Care's damages against the defendants defaulted in the Ruling, including the Debtors.

49.    The Maricopa County Superior Court conducted a status conference with respect to the Arizona Litigation on September 23, 2011. Upon being advised that Mr. and Mrs. Paulos had filed chapter 7 bankruptcy in the District of Arizona on September 19, 2011, the Maricopa County Superior Court indicated that the November default damages hearing would be stayed with respect to the Paulos'.

50.    On October 4, 2011, in the Paulos bankruptcy case, Science Care filed its Motion for Relief from the Automatic Stay to Permit State Court to Liquidate Damages Against Debtors and for Determination that the Stay Does Not Apply to Damages Determination Against Non-Debtors GenLife Institute, LLC and Individual Co-Defendants (the "Paulos Motion to Lift Stay").

51.    On October 27, 2011, the Maricopa County Superior Court granted a request by Genlife to continue the November 21-23, 2011 date on which the default damages hearing was scheduled so that this Court could determine the issues presented in the Paulos Motion to Lift Stay prior to the default damages hearing. The new default damages hearing date is March 21-23, 2012.

52.    The Arizona Bankruptcy Court granted Science Care's Motion to Lift Stay by order dated November 15, 2011 that states, in pertinent part: "IT IS HEREBY ORDERED that the automatic stay is lifted to permit the court to liquidate the amount of Science Care, Inc.'s damages against the Debtors in *Science Care, Inc. v. Donna Goyette, et al.*, Case No.

807130

14

CV2—9-032397 (the 'State Court Litigation')."

53.     On October 19, 2011 Science Care filed in this bankruptcy case its Motion for Relief from the Automatic Stay to Permit State Court to Liquidate Damages Against Debtors and for a Determination the Stay Does Not Apply to Damages Determination Against Non-Debtors GenLife Institute, LLC. (Doc.#11) ("Breedlove Motion for Relief").

54.     The Breedlove Motion for Relief came on for hearing on December 7, 2011. After hearing testimony and arguments of counsel the Court found the automatic stay should be modified to allow the Arizona State Court to determine the damages. The Court also found the automatic stay did not apply to GenLife Institute, LLC. On December 14, 2011 the order sustaining Science Care's motion to modify the automatic stay was entered in this case. (Doc.#34).

## COUNT ONE

### (Non-Dischargeability Under Section 523(a)(2)(A))

55.     Science Care repeats the allegations contained in paragraphs 1 through 55 and in all other counts of this Complaint as if set forth here in full.

56.     Section 523(a)(2)(A) of the Bankruptcy Code provides that a discharge does not discharge an individual debtor from any debt "for money, property, . . . to the extent obtained by—(A) false pretenses, a false representation, or actual fraud . . . ."

57.     Acting in his fiduciary capacity as an executive officer of Science Care, Mr. Breedlove deliberately and knowingly concealed from Science Care the material fact that he was misappropriating trade secrets, breaching his fiduciary duties, conspiring with others, aiding and abetting others and engaging in acts of unfair competition in the establishment of Genlife as a competing business to Science Care.

58.     Further, acting in his fiduciary capacity as an executive officer of Science Care, Mr. Breedlove, among other things, deliberately and knowingly obtained the Science

807130

Care customer list, referral source list, equipment list, confidential policies and procedures, and internal legal advise regarding regulatory requirements for businesses like Science Care under the guise of conducting legitimate Science Care business. 60.   Further,  acting in his fiduciary capacity as an executive officer of Science Care, Mr. Breedlove secretly caused Science Care customers to switch their business to Genlife, including one of Science Care's most valuable top clients, Ross University.

59.    Science Care was ignorant of the facts concealed from it, or misrepresented to it, by Mr. Breedlove.

60.    Mr. Breedlove intended that Science Care remain ignorant of the facts concealed and misrepresented, and that it conduct its business affairs in and based on such ignorance, and Science Care did so.

61.    Science Care has been damaged as a result of Mr. Breedloves concealment and misrepresentation, and the Debtors have incurred a non-dischargeable debt to Science Care as reflected in the Superior Court's Ruling, among other things, and in an amount to be determined in the Arizona Litigation.

## COUNT TWO

(Non-Dischargeability Under Section 523(a)(4) (Defalcation))

62.    Science Care repeats the allegations contained in paragraphs 1 through 63 and in all other counts of this Complaint as if set forth here in full.

63.    Section 523(a)(4) of the Bankruptcy Code provides that a discharge does not discharge an individual debtor from any debt "for fraud or defalcation while acting in a fiduciary capacity . . . ."

64.    Mr. Breedlove misappropriated and/or destroyed Science Care's trade secrets and confidential information, and thus committed defalcation with respect to specific Science Care property held by him in a fiduciary capacity, and the Debtors have incurred a

807130

non-dischargeable debt to Science Care with respect to such defalcation, as reflected in the Superior Court's Ruling and in an amount to be determined in the Arizona Litigation.

65.    Further, acting in his fiduciary capacity as an executive officer of Science Care, Mr. Breedlove, among other things, secretly caused Science Care customers to switch their business to Genlife, including one of Science Care's most valuable top clients, Ross University.  Mr. Breedlove thus committed defalcation with respect to specific Science Care property entrusted to him in his fiduciary capacity, and the Debtors have incurred a non-dischargeable debt to Science Care with respect to such defalcation, as reflected in the Superior Court's ruling, among other things, and in an amount to be determined in the Arizona Litigation.

## COUNT THREE

### (Non-Dischargeability Under Section 523(a)(4) (Embezzlement))

66.    Science Care repeats the allegations contained in paragraphs 1 through 67 and in all other counts of this complaint as if set forth here in full.

67.    Section 523(a)(4) of the Bankruptcy Code provides that a discharge does not discharge an individual debtor from any debt for "embezzlement, or larceny . . . ."

68.    Acting in his fiduciary capacity as an executive officer of Science Care, Mr. Breedlove engaged in embezzlement and larceny with respect to the misappropriated and destroyed trade secrets and confidential information and the Debtors have incurred a non-dischargeable debt to Science Care with respect to such embezzlement or larceny, as reflected in the Superior Court's Ruling, among other things, and in an amount to be determined in the Arizona Litigation.

69.    Further, acting in his fiduciary capacity as an executive officer of Science Care, Mr. Breedlove secretly caused Science Care customers to switch their business to Genlife, and Mr. Breedlove caused Science Care to fund embalming training for the benefit

807130

17

of Genlife while excluding Science Care employees from the training. As a result of this embezzlement or larceny, the Debtors have incurred a non-dischargeable debt to Science Care, as reflected in the Superior Court's Ruling, among other things, an in an amount to be determined in the Arizona Litigation.

## COUNT FOUR

### (Non-Dischargeability Under Section 523(a)(6))

70. Science Care repeats the allegations contained in paragraphs 1 through 71 and in all other counts of this Complaint as if set forth here in full.

71. Section 523(a)(6) of the Bankruptcy Code provides that a discharge does not discharge an individual debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity[.]"

72. Acting in his fiduciary capacity as an executive officer of Science Care, Mr. Breedlove has willfully and maliciously injured Science Care and its property by misappropriating trade secrets, breaching his fiduciary duties, conspiring with others, aiding and abetting others and engaging in acts of unfair competition in the establishment of Genlife as a competing business to Science Care. Such conduct constituted wrongful acts, voluntarily committed by Mr. Breedlove with knowledge that the acts were wrongful and would necessarily cause harm to Science Care. Thus, the Debtors have incurred a non-dischargeable debt to Science Care with respect to such willful and malicious injury, as reflected in the Superior Court's Ruling and in an amount to be determined in the Arizona Litigation.

73. Further, acting in his fiduciary capacity as an executive officer of Science Care, Mr. Breedlove has willfully and maliciously injured Science Care and its property by undermining the business operations of Science Care in favor of Genlife by secretly causing Science Care customers to switch their business to Genlife. Such conduct

807130

18

constituted wrongful acts, voluntarily committed by Mr. Breedlove with knowledge that the acts were wrongful and would necessarily cause harm to Science Care. Thus, the Debtors have incurred a non-dischargeable debt to Science Care with respect to such willful and malicious injury, as reflected in the Superior Court's ruling, among other things, and in an amount to be determined in the Arizona Litigation.

WHEREFORE, Science Care respectfully prays for judgment against the Debtors:

A.    On Count One, determining that the debt owed to Science Care by the Debtors, in an amount to be determined in the Arizona Litigation, is not dischargeable under Section 523(a)(2)(A) of the Bankruptcy Code.

B.    On Counts Two and Three, determining that the debt owed to Science Care by the Debtors, in an amount to be determined in the Arizona Litigation, is not dischargeable under Section 523(a)(4) of the Bankruptcy Code.

C.    On Count Four, determining that the debt owed to Science Care by the Debtors, in an amount to be determined in the Arizona Litigation, is not dischargeable under Section 523(a)(6) of the Bankruptcy Code.

D.    Awarding Science Care such other and further relief as the Court deems just and proper.

s/ L. Win Holbrook
L. Win Holbrook, OBA #4284
ANDREWS DAVIS, PC
100 North Broadway
Suite 3300
Oklahoma City, OK 73102
Telephone: (405) 235-8735
wholbrook@andrewsdavis.com

Wh\sciencecare\adversary\complaint-final

807130

19

8104 (FORM 104) (08/07)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|
| **PLAINTIFFS**    Science Care Inc, an Arizona Corp | **DEFENDANTS**   David Carl Breedlove and Kellie Michelle Breedlove, husband and wife |
| **ATTORNEYS** (Firm Name, Address, and Telephone No.) Andrews Davis, P.C. 100 North Broadway, Ste 3300 Oklahoma City, OK 73102 | **ATTORNEYS** (If Known) |

| PARTY (Check One Box Only) | | PARTY (Check One Box Only) | |
|---|---|---|---|
| o Debtor | o U.S. Trustee / Bankruptcy Admin | ● Debtor | o U.S. Trustee/Bankruptcy Admin |
| o Creditor | ● Other | o Creditor | o Other |
| o Trustee | | o Trustee | |

**CAUSE OF ACTION**   Complaint for determination of non-dischargeablity per 11 USC 523(a)(2)(A), (a)(4), (a)(6)

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

FRBP 7001(1) - Recovery of Money/Propesty
o 11-Recovery of money/property - §542 turnover of property
o 12-Recovery of money/property - §547 preference
o 13-Recovery of money/property - §548 fraudulent transfer
o 14-Recovery of money/property - other

FRBP 7001(2) - Validity, Priority or Extent of Lien
o 21-Validity, priority or extent of lien or other interest in property

FRBP 7001(3) - Approval of Sale of Property
o 31-Approval of sale of property of estate and of a co-owner - §363(h)

FRBP 7001(4) – Objection / Revocation of Discharge
o 41-Objection / revocation of discharge - §727(c),(d),(e)

FRBP 7001(5) - Revocation of Confirmation
o 51-Revocation of confirmation

FRBP 7001(6) - Dischargeability
o 66-Dischargeability - §523(a)(1 ),(14),(14A) priority tax claims
(1)● 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
(3)●67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny
(continued next column)

FRBP 7001(6) - Dischargeability (continued)
o 61-Dischargeability - §523(a)(5), domestic support
(2)● 68-Dischargeability - §523(a)(6), willful and malicious injury
o 63-Dischargeability - §523(a)(8), student loan
o 64-Dischargeability - §523(a)( 15), divorce or separation obligation (other than domestic support)
o 65-Dischargeability - other

FRBP 7001(7) - Injunctive Relief
o 71-Injunctive relief - imposition of stay
o 72-Injunctive relief - other

FRBP 7001(8) Subordination of Claim or Interest
o 81-Subordination of claim or interest

FRBP 7001(9) Declaratory Judgment
o 91-Declaratory judgment

FRBP 7001(10) Determination of Removed Action
DOI-Determination of removed claim or cause

Other
o SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*
o 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| o Check if this case involves a substantive issue of state law | o Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| o Check if a jury trial is demanded in complaint | Demand $   Unknown |

Other Relief Sought

BI04 (FORM 104) (08/07), Page 2

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | | |
|---|---|---|---|
| NAME OF DEBTOR: David Carl Breedlove and Kellie Michelle Breedlove | | BANKRUPTCY CASE NO. | 11-15459 SAH |
| DISTRICT IN WHICH CASE IS PENDING Western | | DIVISION OFFICE 875 | NAME OF JUDGE Sarah Hall |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | | |
| PLAINTIFF | DEFENDANT | | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | | NAME OF JUDGE |

SIGNATURE OF ATTORNEY (OR PLAINTIFF)

| DATE  January 3, 2012 | PRINT NAME OF ATTORNEY (OR PLAINTIFF) L. Win Holbrook |
|---|---|

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CMIECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiffs attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

Plaintiffs and Defendants. Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

Attorneys. Give the names and addresses of the attorneys, if known.

Party. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

Demand. Enter the dollar amount being demanded in the complaint.

Signature. This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.